IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| INTERESTED UNDERWRITERS AT LLOYD'S and THAI TOKAI PRODUCT CO. LTD., | |
| **Plaintiffs,** | |
| **v.** | **1:03-cv-1778-WSD** |
| M/T SAN SEBASTIAN and her freights, *in rem*, and OILMAR CO., LTD. | |
| **Defendants.** | |
| PT CABOT INDONESIA, and ATLANTIC MUTUAL INS. CO., intervening Plaintiffs | |
| **Intervening Plaintiffs,** | |
| **v.** | |
| M/T SAN SEBASTIAN and her freights, *in rem*, and OILMAR CO. LTD., | |
| **Defendants.** | |

## <u>OPINION AND ORDER</u>

This matter is before the Court on Plaintiffs Interested Underwriters at

Lloyd's ("Lloyd's") and Thai Tokai Product Co., Ltd. ("Thai Tokai")

("collectively, "Original Plaintiffs") Motion to Compel Arbitration. [61]  Also

before the Court is Defendant Oilmar Co. Ltd.'s ("Oilmar") Motion to Strike

Plaintiffs' Cargo Claim [79], and various discovery and trial-related motions raised

by Oilmar [78, 84, 85].

## I.  <u>BACKGROUND</u>

Oilmar owns the ship M/T San Sebastian,[1] ("San Sebastian").  On March 7,

2003, Oilmar entered into a charter party agreement (the "Charter Party") with

Energy Transport Ltd. ("ETL").  The Charter Party provided for the San Sebastian

to carry carbon black feedstock ("carbon black") sold by ETL from the United

States to a purchaser in Thailand.  ETL agreed to pay a set "freight rate" for the use

of the San Sebastian in shipping the carbon black.  Oilmar is a Panama corporation,

and the San Sebastian is its only asset.  ETL is a United States corporation and a

wholly owned subsidiary of the P.T. Cabot Corporation ("P.T. Cabot"), which has

intervened as a Plaintiff in this action.

ETL's carbon black did not require the entire cargo space of the San

Sebastian.  Under the Charter Party, however, ETL was obligated to charter the

San Sebastian's entire cargo space.  The Charter Party permitted ETL to sub-

charter any cargo space that it did not itself use.  ETL chartered the remaining

---

[1]  "M/T" means motor tank vessel.  It is sometimes referred to as "M/V."

2

space on the San Sebastian to two companies, Pacific Oil and Adam Maritime,

through sub-charter party agreements.  Adam Maritime is the shipping arm of

Glencore Ltd. ("Glencore"), which had sold and agreed to deliver carbon black to

Thai Tokai in Thailand.  Lloyd's underwrote insurance for the carbon black

feedstock purchased by Thai Tokai, and is subrogated to Thai Tokai for the

purposes of this litigation.

The Charter Party dictated the terms upon which ETL could sub-charter

cargo space on the San Sebastian.  The Charter Party required sub-charters to be

issued largely on the same terms, except for freight rate, as the Charter Party

between Oilmar and ETL.  The Charter Party also prescribed the form required for

any Bills of Lading[2] for sub-chartered goods.  The Charter Party provided

expressly that "[t]he Master shall, upon request, sign Bills of Lading in the form

appearing below for all cargo shipped but without prejudice to the rights of the

Owner and Charterer under the terms of this Charter."  (Charter Party, ¶ 20.)  The

Bill of Lading form required by the Charter Party states that "all the terms

whatsoever of [the Charter Party] except the rate and payment of freight specified

---

[2]  Bills of Lading are both titles to property and contracts for shipment of that
property.  Blacks Law Dictionary (8th ed. 2004).

therein apply to and govern the rights of the parties connected in this shipment."

Three bills of lading were executed for the shipments of carbon black on the San Sebastian.  Bills of lading were held by ETL, Carbon Black, and Thai Tokai. The Bill of Lading for the goods belonging to Thai Tokai was issued "on behalf of the Master" of the San Sebastian.

During the voyage, an explosion and fire occurred on the San Sebastian. The fire damaged some of the cargo, and damaged the San Sebastian so severely that the undamaged carbon black had to be transferred to another vessel for delivery.

After the San Sebastian fire, P.T. Cabot, Carbon Black, and Thai Tokai (and Lloyd's as Thai Tokai's subrogee) sued the San Sebastian and Oilmar in various courts, including this Court, the District of Connecticut, and the Southern District of New York, seeking damages as a result of the fire and arguing, among other things, that the San Sebastian was unseaworthy.  This action was filed by Lloyd's and Thai Tokai.  P.T. Cabot, and their subrogated insurer, intervened as Plaintiffs.

At issue in the present motions is whether the Original Plaintiffs may compel Oilmar to arbitrate their claims pursuant to the arbitration clause in the Charter Party between Oilmar and ETL.  That arbitration clause states, "Any and

all differences and disputes of whatsoever nature arising out of this Charter shall be put to arbitration . . ."  (Charter Party, ¶ 24).

The Original Plaintiffs argue that Oilmar is obligated to arbitrate under the Charter Party under theories of contract and equitable estoppel.  Oilmar also moves to strike the Original Plaintiffs' claim for damage to the cargo.  A series of discovery and trial motions raised by Oilmar are also pending.

## II.   <u>DISCUSSION</u>

The manner in which this dispute has been litigated is troubling.  The Original Plaintiffs' litigation strategy appears to involve a calculated effort to prolong this action by substantially refusing to participate in discovery until they can see what happens in the "real" litigation in Connecticut.  The Original Plaintiffs do not deny that they have chosen this tactic, and they now seek to delay this action further by moving to compel arbitration, more than three years after they filed their complaint in the case.

Both Oilmar and the Original Plaintiffs, but particularly Oilmar, have further complicated the present action by filing excessive numbers of motions supported by briefing unreasonable in both content and volume, and which ignores page limitation and other requirements of the Local Rules.

The parties are admonished that any further submissions which fail to comply with the page, type, and other requirements of the Local Rules will be refused, and returned to counsel.  The parties are further counseled that, contrary to their practice thus far, regard for and citation to the laws and precedent which bind this Court are the *sine qua non* of persuasive advocacy.  After more than three years of apparently deliberate delay tactics and excessive motion practice, it is time to bring this case to resolution.

A.   Motion to Strike Cargo Claim

On May 10, 2004, the Original Plaintiffs moved the Court for permission to amend their complaint to add a claim for damage to cargo in the amount of $65,000, and to add a claim for indemnification against future salvage payments. On March 24, 2005, the Court granted this motion in part, permitting the Original Plaintiffs to add the cargo damage claim only.  Oilmar alleges that the Original Plaintiffs have refused to provide discovery of any kind related to the cargo damage claim.  Oilmar claims specifically that the Original Plaintiffs have expressly and repeatedly refused to answer interrogatories or produce witnesses to be deposed in connection with the cargo damage claim.

Under Federal Rule of Civil Procedure 37(d), if a party refuses to appear at a deposition or to serve answers or objections to interrogatories, "the court in which the action is pending on motion may make such orders in regard to the failure as are just."  According to the Advisory Counsel notes, Rule 37(d) is intended "to make clear that a party may not properly remain completely silent even when he regards a . . . a set of interrogatories . . . as improper and objectionable.  If he desires not to appear or not to respond, he must apply for a protective order."

Rule 37 "confers upon district court judges broad discretion . . . ." U.S. v. Certain Real Property Located at Route 1, Bryant, Ala., 126 F.3d 1314, 1317 (11th Cir. 1997).  Rule 37(d) expressly authorizes the Court to issue "[a]n order striking out the pleadings or parts thereof, or staying further proceedings until the order is obeyed, or dismissing the action or proceeding or any part thereof, or rendering a judgment by default . . ." Fed. R. Civ. P. 37(b)(2)(C).  Rule 37 authorizes a court to fashion just relief for discovery misconduct.  See United States v. $239,500 in U.S. Currency, 764 F.2d 771 (11th Cir. 1985).

The Original Plaintiffs do not dispute that they have refused to provide discovery on the cargo damage claim. They do not offer any excuse or justification for their failure, nor do they propose to provide the discovery requested on this

-7-

claim, which they sought by contested motion to add to their complaint.  The

Original Plaintiffs instead argue that the Court should preserve the cargo claim for

a hypothetical future arbitration, and that the Court should relieve them of the

requirement to provide to Oilmar relevant discoverable information.  The Original

Plaintiffs alternatively propose that the Court dismiss the cargo damages claim

with leave to reinstate it should their motion to compel arbitration be granted.

The Original Plaintiffs' position is indefensible.  The Federal Rules of Civil

Procedure set forth discovery duties that parties in federal court must obey,

regardless of whether they anticipate resolving their dispute in a forum other than

federal court.  Having alleged the claim for cargo damages in their complaint, the

Original Plaintiffs were required to provide appropriate discovery, including

requested documents and answers to properly issued interrogatories, relevant to

that claim.  If the interrogatories issued by Oilmar were objectionable, then the

Original Plaintiffs were required by the Federal Rules to assert the specific

objections or privileges that might entitle them to withhold answering.  They did

not do so, choosing instead to refuse the requests outright.  The Original Plaintiffs

offer no justification or excuse for their behavior, preferring instead to contend

that "it is not cost effective for plaintiffs to prosecute the cargo claim in this federal court action."

In light of the Original Plaintiffs' dilatory discovery behavior, and in response to their admission that they do not intend to pursue the cargo damage claim, the Court strikes the cargo damage claim from this action.[3]

B.    Arbitration

In evaluating whether to compel arbitration, the Court must first "determine whether the parties agreed to arbitrate that dispute." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc. 473 U.S. 614, 626 (1985). "In the absence of an agreement to arbitrate, a court cannot compel parties to settle their dispute in an arbitral forum." Klay v. All Defendants, 389 F.3d 1191, 1200 (11th Cir. 2004). Questions of arbitrability "must be addressed with a healthy regard for the federal policy favoring arbitrations." MS Dealer Service Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir. 1999) (quotations omitted).  Although the parties' intentions

_____

[3] The Original Plaintiffs propose that the Court strike the cargo damages claim "subject to reinstatement" if they prevail on their arbitration claim.  This is the kind of solution that the Original Plaintiffs could have proposed to the Court in a motion for a protective order, if they did not wish to provide the discovery sought by Oilmar.  Striking the cargo damages claim without leave to reinstate is an appropriate sanction, expressly provided for under Rule 37, and proportional to the Original Plaintiffs misconduct.

expressed in the Charter Party control the ultimate question of arbitrability, "those intentions are generously construed as to issues of arbitrability." Id.

In the Eleventh Circuit, nonsignatories to a contract may enforce an arbitration clause against a signatory under "certain limited exceptions." Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753, 756-57 (11th Cir. 1993). The first exception is equitable estoppel. MS Dealer, 177 F.3d at 947. Another exception applies when "the parties to a contract together agree, upon formation of their agreement, to confer certain benefits . . . upon a third party, affording that third party rights of action against them under the contract." Id. (quotations omitted). In other words, a nonsignatory can enforce the terms of a contract if it is an intended beneficiary to the contract. The Original Plaintiffs argue that their claims are arbitrable under both of these exceptions.

1.    *Subject-Matter Jurisdiction*

Oilmar raises two "subject-matter jurisdiction" challenges to this action: (i) because there is no "agreement in writing" between Oilmar and Lloyd's to arbitrate, Lloyd's cannot seek to compel arbitration under the Convention on the Recognition and Enforcement of Foreign and Arbitral Awards of June 10, 1958 (the "New York Convention" or "NYC"), codified at 9 U.S.C. §§ 201 et. seq., nor

may they seek to stay the current proceedings under the Federal Arbitration Act

("FAA"),  9 U.S.C. §§ 1 et. seq.; and (ii) that even if a written agreement to

arbitrate exists, this Court cannot compel parties to arbitrate in New York under the

FAA, which authorizes a court to compel arbitration only in the district in which it

sits.

Oilmar argues, essentially, that neither the NYC nor the FAA permit the

Court to compel arbitration under the terms required by the Charter Party, and thus

the Court lacks subject matter jurisdiction.  This argument is not persuasive.  The

Court has subject matter jurisdiction because this case was filed in admiralty

pursuant to 28 U.S.C. § 1333, which grants to district courts original jurisdiction of

"[a]ny civil case of admiralty or maritime jurisdiction, saving to suitors in all cases

all other remedies to which they are otherwise entitled."  Whether the Court can

compel the arbitration that the Original Plaintiffs seek is not a jurisdictional

question, but rather whether the Original Plaintiffs are, in addition to filing suit in

this Court, entitled to "other remedies" reserved to them under the jurisdiction-

granting statute.

Oilmar assumes, wrongly, that the Original Plaintiffs must bring their action under either the FAA or the NYC.[4]  As the Second Circuit has noted, both the FAA and the NYC have "overlapping coverage" to a dispute "to the extent that they do not conflict."  Yusuf Ahmed Alganim & Sons, W.L.L. v.Toys "R" Us, Inc., 126 F.3d 15, 20 (2d. Cir. 1997) (citations omitted).  In the case of a conflict between the provisions of the two statutory schemes, the NYC governs "to the extent that [it] prescribes the exclusive grounds for relief . . ."  Id.

Oilmar argues that the FAA grants the Court authority only to order arbitration "within the district in which the petition for an order directing such arbitration is filed."  9 U.S.C. § 4.  The Court agrees.  On this point, the FAA is in clear conflict with the NYC, which provides that "[a] court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States." 9 U.S.C. § 206.  See Energy Transport, Ltd. V. M.V. San Sebastian, 348 F.Supp.2d 186, 201 (S.D.N.Y. 2004) (finding FAA to conflict with NYC in this regard in litigation between Oilmar and ETL over the same facts at

---

[4]  Oilmar, Thai Tokai, and Lloyd's are all non-U.S. companies, and are citizens of signatory states to the NYC.

issue here).  Because granting the Original Plaintiffs' motion to compel arbitration would require the Court to order arbitration in New York, outside of the district in which it sits, the FAA and NYC are in conflict and the NYC governs.  The Court is authorized to order arbitration in New York under the NYC.

Oilmar next argues that the NYC does not permit the Court to grant the motion to compel arbitration, because that treaty requires an "agreement in writing" to arbitrate.  9 U.S.C. § 202.  Oilmar relies primarily on Filanto, S.p.A. v. Chilewich Intern. Corp., 789 F.Supp. 1229 (S.D.N.Y. 1992) to support its argument.  The court in that case stated: "Courts interpreting this 'agreement in writing' requirement have generally started their analysis with the plain language of the Convention . . . . and have then applied that language in light of federal law, which consists of generally accepted principles of contract law . . . " Id. at 1237. The court in Filanto found that the parties in that case had an "agreement in writing" for the purposes of the NYC when the agreement signed by the parties incorporated by reference the agreement containing the arbitration clause.  Id. at 1240.  An identical situation exists here.  The Court finds that Oilmar and Thai Tokai had an agreement in writing which incorporated the Charter Party, and that Thai Tokai was an intended beneficiary to the Charter Party under generally

accepted principles of contract law.[5]  Accordingly, considering the interplay

between the FAA and the NYC, the Court concludes that the NYC governs this

dispute, at least insofar as it grants the Court authority to order arbitration in New

York.

---

[5]  Under generally accepted principles of contract law, a third-party
nonsignatory to a contract can in some circumstances invoke the terms of that
contract.  According to the Restatement (Second) of Contracts, "[u]nless otherwise
agreed between promisor and promisee, a beneficiary of a promise is an intended
beneficiary if . . . . the circumstances indicate that the promisee intends to give the
beneficiary the benefit of the promised performance."  Id. at § 302 (1981).
     The Charter Party and the Bill of Lading demonstrate on their face that Thai
Tokai is an intended beneficiary to the Charter Party.  The Charter Party expressly
permitted ETL to sub-charter cargo space on the San Sebastian.  The Charter Party
further provided that any Bills of Lading issued for cargo carried in sub-chartered
space would be, except for rate and payment of freight, subject to the terms of the
Charter Party.  The Bill of Lading, which is signed on behalf of the Master of the
San Sebastian, expressly refers to and incorporates "all the terms whatsoever" of
the Charter Party.  See, Energy Transport, Ltd. V. M.V. San Sebastian, 348
F.Supp.2d 186, 204 (S.D.N.Y. 1984) (holding that the Bills of Lading issued by the
San Sebastian incorporated the Charter Party).
     The plain language of the Charter Party and Bills of Lading issued pursuant
to it indicate that sub-charterers are intended to benefit from the terms of the
Charter Party.  Oilmar's obligations under the Charter Party, specifically the
warranty of seaworthiness, run expressly both to ETL and to sub-charterers like
Thai Tokai.  Oilmar's obligations as a carrier, and its rights to receive payment, are
nearly identical with respect to ETL and Thai Tokai.

This finding is not dispositive of the Original Plaintiffs' motion to compel arbitration.  Although Thai Tokai had an "agreement in writing" with Oilmar, further discussion is required concerning whether, by virtue of that agreement or otherwise, the Original Plaintiffs are entitled to enforce the Charter Party's arbitration clause against Oilmar at this time.

### 2. *Intended Beneficiary*

Oilmar argues that, even if Thai Tokai can enforce the Charter Party's arbitration clause as an intended beneficiary, it has waived the right to do so.  The Court agrees.  "Arbitration should not be compelled when the party who seeks to compel arbitration has waived that right."  Morewitz v. West of England Ship Owners Mur. Protection and Indemnity Assoc., 62 F.3d 1356, 1365 (11th Cir. 1995).  A party waives the right to compel arbitration when they "substantially participate in litigation to a point inconsistent with an intent to arbitrate and this participation results in prejudice to the opposing party."  Id. at 1366.  Prejudice exists "in situations where the party seeking arbitration allows the opposing party

to undergo the types of litigation expenses that arbitration was designed to alleviate." Id.

The Original Plaintiffs filed suit on June 26, 2003. In their complaint, they sought attachment of Oilmar's assets in the Northern District of Georgia, and they also asserted claims for damages. On May 10, 2004, after nearly a year of litigation, the Original Plaintiffs sought leave to amend their complaint to add further damages claims, which this Court granted. The Original Plaintiffs did not manifest any intention to seek arbitration in this action until they filed the motion to compel arbitration on August 30, 2006–more than three years after filing their original complaint. The protracted history of this litigation is substantial, and inconsistent with an intent to arbitrate.

These three years of litigation have prejudiced Oilmar. To comply with the Federal Rules of Procedure and the scheduling orders of this Court, Oilmar has been required to propound discovery, and to pursue discovery from the Original Plaintiffs. Such discovery practice can be time consuming and expensive, and it is precisely these types of litigation expense that arbitration is intended to avoid.

The Original Plaintiffs' argue that waiver is inapplicable in the "special" circumstance of a suit initiated pursuant to maritime attachment laws. The Original

-16-

Plaintiffs argue that, because 9 U.S.C. § 8 permits aggrieved parties to begin admiralty proceedings by moving for maritime attachment, and then to move for arbitration, the right to arbitration cannot be waived in the maritime context. This argument is baseless. 9 U.S.C. § 8 clarifies that aggrieved parties in admiralty are not precluded from seeking to arbitrate if they move first to secure by attachment the property of the defendant. Oilmar does contend that arbitration is barred because the plaintiffs filed suit *in rem*. Oilmar contends that the Original Plaintiffs have waived their right to arbitrate because they initiated this action, litigated it for over three years, required Oilmar to incur substantial discovery costs, and then switched litigation tactics, suddenly and without explanation asserting a contractual right to arbitration that existed at the time they filed the original complaint. The Original Plaintiffs do not cite any authority for the proposition that the prejudicial litigation tactic they chose to employ at the eleventh hour is specially permitted by admiralty statutes.

3.   <u>*Equitable Estoppel*</u>

While not required to do so in light of the finding of waiver, the Court also considers whether Oilmar would, in the absence of that waiver, be equitably estopped from refusing to arbitrate with the Original Plaintiffs under the Charter

-17-

Party.  The Connecticut court, in a suit involving the Original Plaintiffs and Oilmar (among other parties), decided this identical issue.  The equitable estoppel theory was litigated vigorously by Oilmar, Lloyd's, and Thai Tokai in the Connecticut proceeding.  Although the Original Plaintiffs prevailed initially, Oilmar moved for reconsideration.  On May 31, 2006, the Connecticut court granted the motion for reconsideration, finding that there was not a sufficient degree to intertwinedness between Oilmar, the Original Plaintiffs, and the Charter Party to justify the application of equitable estoppel.  The Original Plaintiffs moved for reconsideration of this Order.  The Connecticut court denied that motion without opinion on October 16, 2006.

Oilmar appears to assert that this decision in the Connecticut court collaterally estops the Original Plaintiffs' equitable estoppel argument.  The Original Plaintiffs argue that Oilmar cannot assert collateral estoppel based on decisions of the Connecticut court because it "acquiesced" in splitting the present dispute between the Connecticut court and this Court.  Although parties are generally prohibited from splitting claims between two different courts, splitting is permitted when "[t]he parties have agreed in terms or in effect that the plaintiff may split his claim, or the defendant has acquiesced therein."  Restatement (2d) of

-18-

Judgments, § 24(a)(1) (1982).   In cases where a plaintiff maintains simultaneous actions, "the failure of the defendant to object to the splitting of the plaintiff's claim is effective as an acquiescence in the splitting of the claim." Id. at cmt. a.  If courts imposed *res judicata* in any of its forms where a defendant agreed or acquiesced in engaging in multiple litigations, they "would encourage litigants to engage in dishonest (or at least less than forthright) behavior to gain tactical advantage." Matter of Super Van, Inc., 92 F.3d 366, 371 (5th Cir. 1996).

Oilmar's conduct manifests that it acquiesced in being subjected to multiple judgments on identical issues.  Oilmar has not filed a motion to change venue, and actively opposed the Original Plaintiffs motion to consolidate this case with the Connecticut proceedings.  Oilmar cannot now seek to assert preclusive effect for decisions in the Connecticut proceeding.

If the Original Plaintiffs had not waived their right to demand arbitration, this Court would reach the same conclusion as the Connecticut court, although under different reasoning.  In the Eleventh Circuit, equitable estoppel permits a non-signatory to compel arbitration "in two different circumstances." MS Dealer, 177 F.3d at 948.  First, equitable estoppel applies when a signatory must rely on the terms of a written agreement containing an arbitration provision in asserting

claims against a non-signatory.  "When each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement, and arbitration is appropriate."  Id.  Equitable estoppel can also apply when a signatory raises allegations of "substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract."  Id. (quotation and citation omitted).  This second estoppel theory is similar to the first in the sense that it is defensive; the contract containing the arbitration clause is central to a signatory's claims, and the nonsignatory's estoppel argument seeks to enforce the remainder of the contract.

In In re Humana, Inc. Managed Care Litig., 285 F.3d 971, 976 (11th Cir. 2002) (reversed on other grounds at Pacificare Health Systems, Inc. v. Book, 537 U.S. 946 (2002)), the Eleventh Circuit emphasized that the assertion of claims related to a contract by a signatory is a necessary element of both theories of equitable estoppel–in other words, both theories of equitable estoppel are inherently defensive.  285 F.3d at 976.  "The [signatory's] actual dependence on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the *sine qua non* of an appropriate situation for applying equitable estoppel."  Id.  See also Blinco, 400 F.3d at 1312 ("Equitable estoppel

precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes.").

In the present case, the Original Plaintiffs seek to use equitable estoppel offensively.  Oilmar has not asserted any claims under the Charter Party, the sub-charters, or the Bills of Lading against the Original Plaintiffs.  Equitable estoppel prevents contract signatories from using contracts as both a sword and shield against a nonsignatory.  Oilmar has not sought to use the Charter Party at all against the Original Plaintiffs.[6]  Equitable estoppel simply does not apply in this situation.

## III.   CONCLUSION

For the reasons stated above,.

**IT IS HEREBY ORDERED** that Defendant's Motion to Strike Plaintiffs' Cargo Claim [79] is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Compel Arbitration [61] is **DENIED**.

---

[6]  The Original Plaintiffs contend that Oilmar will "undoubtedly" attempt to use the Charter Party in its own defense.  Whether or not such a defensive use of the Charter Party would give rise to equitable estoppel is not a question currently before the Court.  It is undisputed that, whatever Oilmar might do in the future, it has not yet done anything to require the Court in equity to enforce the Charter party on behalf of a nonsignatory.

**IT IS FURTHER ORDERED** that a hearing on Defendant's Motion in Limine Excluding From Evidence the Opinion and Testimony of Plaintiffs' Designated Witness, David A. Robbins [78], Defendant's Motion in Limine Excluding from Evidence the Opinion and Testimony of Plaintiff's Designated Witness, Graeme Bowles [84], and Defendant's Motion to Strike Testimony of Stephen Pink for Refusal to Provide Discovery [85], and a pretrial conference in this matter, shall be held at 2:00 p.m. on May 15, 2007, in Room1721, 75 Spring Street, S.W., Atlanta, Georgia.

**IT IS FURTHER ORDERED** that the parties shall not file any further motions in this matter, unless such motions are permitted by the Local Rules and leave to file is first obtained from the Court.

**SO ORDERED**, this 3rd day of April, 2007.


WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE